## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JE DONNA DINGES and
INDIA DINGES,

                    Plaintiffs,

                                      Case No.

v.

                                        Hon.

RYAN WILDE

                    Defendant.           **JURY TRIAL DEMANDED**

_____/

Michael J. Steinberg (P43085)
Anna Silk*
Sarah Hall*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
annasilk@umich.edu
samarie@umich.edu
Counsel for Plaintiff

* Student Attorneys practicing pursuant to
Local Rule 83.21
_____/

## **<u>COMPLAINT</u>**

## INTRODUCTION

1.      Plaintiffs Je Donna Dinges and her daughter, India Dinges, bring this civil rights action against their former neighbor, Defendant Ryan Wilde, because his racist and violent threats forced them to move out of their home.

2.      In 2021, the Dingeses, who are Black, lived next door to Wilde, who is white, in Grosse Pointe Park, a city whose population is about 85% white.

3.      Wilde placed a large Ku Klux Klan flag in a window directly facing the Dingeses' home, placed a full canister of gasoline in the Dingeses' recycling bin, exhibited intimidating behavior, and fired a handgun from his back porch.

4.      The Dingeses believed that Wilde placed the gas canister in their recycling bin with the intent to show how easy it would be to set their home on fire with highly flammable materials typically found in a recycling bin.

5.      The Dingeses were well aware of the history of racist attacks in Metro Detroit to enforce racial segregation in housing, including shooting and firebombing Black homes.

6.      Wilde has a history of committing racist and violent acts, and Grosse Pointe Park law enforcement were cautious about interacting with him because of the many guns in his possession.

1

7.      When the public learned of the KKK flag and gas canister incidents, they were so outraged that they organized a demonstration in the streets of Grosse Pointe Park in support of the Dingeses against Wilde.

8.      Despite the support the Dingeses received from other neighbors, the Dingeses felt threatened by Wilde and lived in constant fear of him.

9.      In December 2021, the Dingeses moved from their Grosse Pointe Park home to escape the mental and physical distress they experienced living next to Wilde.

10.     The Dingeses now bring this action under 42 U.S.C. § 1982 for racial discrimination and unlawful interference with their right to hold property.

11.     The Dingeses also seek relief under state law for ethnic intimidation, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (deprivation of rights).

13.     This Court also has supplemental jurisdiction to hear Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

14.  Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events that
     gave rise to this action occurred in the Eastern District of Michigan and
     Defendant resides in the Eastern District of Michigan.

## PARTIES

15.  Plaintiff Je Donna Dinges is a resident of the State of Michigan, who, at the
     time of the events that gave rise to this case, resided at 1107 Wayburn Street
     in Grosse Pointe Park, Michigan. She currently lives in the Eastern District
     of Michigan.

16.  Plaintiff India Dinges, Je Donna Dinges's daughter, is a resident of the State
     of Michigan, who, at the time of the events that gave rise to this case,
     resided at 1107 Wayburn Street in Grosse Pointe Park, Michigan. She
     currently lives in the Eastern District of Michigan.

17.  Defendant Ryan Kane-Alexander Wilde is, and at all relevant times was, the
     owner and occupant of 1109 Wayburn Street in Grosse Pointe Park,
     Michigan.

## STATEMENT OF FACTS

18.  From 2011 to 2021, Je Donna Dinges and India Dinges lived in a rental
     home at 1107 Wayburn Street in Grosse Pointe Park.

19.   In 2017, Ryan Wilde moved into 1109 Wayburn Street, next door to the
      Dinges home. He resided in that house at the time of the events that gave
      rise to this case.

20.   The Dingeses' home and Wilde's home shared a narrow common walkway
      in between the two structures. The walkway was five feet wide.

21.   The Dingeses had a side door entrance into their home accessible from the
      common walkway. Wilde did not have a side door entrance into his home
      that was accessible from this walkway.

22.   Near the back of the homes and walkway, a fence separated the two
      backyards.

23.   Wilde was unfriendly to the Dingeses, and the two parties did not have a
      cordial relationship.

24.   Around June 2020, Wilde's girlfriend Helena Van Tol and her two young
      children moved into Wilde's home at 1109 Wayburn Street.

**Backyard Gunshots**

25.   Wilde has nine registered handguns and a Concealed Pistol License.

26.   In or around December 2017, soon after Wilde moved in, Je Donna Dinges
      was startled by the sound of repeated gunshots at night.

27.   She looked out her back window and saw sparks flying from a handgun that
      Wilde was shooting repeatedly from his back porch into the air.

28.   Je Donna and several of her neighbors called the police.

29.   When police arrived at 1109 Wayburn Street to investigate the gunshots the following day, Wilde's car was parked outside.

30.   Police officers knocked on Wilde's door, but no one answered.

31.   Wilde came outside only after the officers left.

32.   Later that day, Je Donna Dinges arrived home from a shopping trip and saw Wilde standing in their common walkway.

33.   Prior to this incident, Wilde rarely used this walkway.

34.   Wilde was pacing back and forth in the walkway and staring at Je Donna in an intimidating manner. His pacing physically blocked her path through the common walkway.

35.   Je Donna asked what was wrong, but Wilde did not respond and continued to stare at her.

36.   Je Donna was intimidated by Wilde staring at her in a menacing manner and physically blocking her from moving past him on the walkway.

37.   Je Donna was unable to enter her home through the side door entrance abutting the common walkway.

**Gasoline Canister Incident**

38.   In the summer of 2020, two of Je Donna's neighbors observed multiple gas canisters in Wilde's foyer and took photos of them.

39.     In mid-January 2021, Darrell Dinges, Je Donna Dinges's husband at the time of the events, went to take out the family's recycling.

40.     When Mr. Dinges opened the recycling bin, he saw a gasoline canister inside.

41.     Mr. Dinges picked up the canister and discovered that it was full of gasoline.

42.     The Dinges family's recycling bin was located in their backyard, accessible only via the common walkway. A fence separated the Dingeses' backyard from the common walkway and Wilde's backyard. To enter the Dingeses' backyard, a person would have to open the fence.

43.     When Je Donna went outside to see what was going on, she observed a similar gas canister sitting in Wilde's backyard a few feet from the fence.

44.     Je Donna called the police.

45.     The police arrived, and Je Donna expressed her concern that this incident was a targeted act.

46.     After telling her there was not much they could do, police advised Je Donna to install a security camera to identify the person who placed the gas canister should it happen again.

47.     Following the advice of law enforcement, Je Donna Dinges purchased a motion-sensing camera.

48.   The camera was trained at the back fence and walkway in between the Dingeses' and Wilde's property.

49.   On February 2, 2021, Wilde called the police to report that the security camera was pointed toward his dining area.

50.   The police advised Wilde there was nothing they could do because the camera was inside the Dingeses' home and suggested that Wilde hang up curtains or blinds.

51.   On or around July 21, 2021, India Dinges noticed that Wilde had two canisters of gasoline sitting outside of his front door. *See Exhibit 1.*

52.   The Dingeses understood the placement of the gas canisters on his porch in the open as an attempt by Wilde to intimidate them in response to their continued use of a security camera.

53.   While driving down Wayburn Street that same day, Lauri Read, a city council member, noticed the gas canisters on Wilde's porch and called Je Donna to inform her of what she saw.

54.   Ms. Read then called the police.

55.   The police told Wilde that he could not store gasoline on his front porch.

56.   Wilde then removed the gas canisters from his front porch.

57.    That same month, India Dinges was sitting in her home office at the back of the Dingeses' house. She looked up and saw Wilde staring intimidatingly at her from his window.

58.    Wilde's intimidating stare made India fearful of living in her own home.

### KKK Flag Incident

59.    In February 2021, Wilde hung a "Ku Klux Klan Invisible Empire" flag in a window directly facing the Dingeses' house:



*Photo of the Flag in Wilde's House Facing the Dinges House*

60.    On February 16, 2021, Mr. Dinges observed the "Ku Klux Klan Invisible Empire" flag hanging in the window of Wilde's house for the first time.

61.  The Ku Klux Klan (KKK) is a far-right terrorist organization and hate group. The organization is known for terrorizing, torturing, and killing African Americans. The "Invisible Empire" flag is used by supporters of the KKK to symbolize their endorsement of the organization's hateful beliefs.

62.  The flag, which was hanging approximately five feet from the Dinges home, could not be seen from the street, the sidewalk, or from any other house except for the Dinges family house.

63.  When Mr. Dinges told her about the KKK flag, Je Donna felt terrorized and did not know what to do.

64.  Je Donna decided to post about what happened, along with a photo of the flag, on her private Facebook page.

65.  One of Je Donna's friends put her in contact with Mara MacDonald, a newscaster at WDIV Local 4 - Detroit.

66.  Mara MacDonald called the City of Grosse Pointe Park and the Grosse Pointe Park police department.

67.  Within minutes of Mara MacDonald's call to the police, Grosse Pointe Park police officers arrived at Wilde's house.

68.  One of the police officers on the scene was Detective-Sergeant Narduzzi, an employee of the Grosse Pointe Park Public Safety Department.

69.   Wilde did not come to the door when police knocked, so Detective-Sergeant Narduzzi spoke with Wilde's girlfriend, Helena Van Tol.

70.   Helena Van Tol said that Wilde put up the flag to block their windows from the view of the Dinges family's security camera.

71.   Helena Van Tol stated they did not have money for window curtains or blinds.

72.   Detective-Sergeant Narduzzi offered to purchase window covers for them if they took down the flag immediately.

73.   Helena Van Tol complied.

74.   Helena Van Tol admitted that she understood that the KKK flag was offensive.

75.   Wilde later claimed that he did not know the meaning of the KKK flag.

76.   On February 19, 2021, Detective-Sergeant Narduzzi received a voicemail from Wilde complaining about the Dingeses' camera. The voicemail was filled with racial expletives. Wilde used the "N" word multiple times while referring to Je Donna. *See Exhibit 2*.

## Impact on the Community

77.   The KKK flag incident sparked widespread outrage in Grosse Pointe Park.

78.   On February 21, 2021, about 800 people attended a "Hate Has No Home Here" rally in Grosse Pointe Park.

79.    The incident also sparked outrage across the country and the globe, with articles featured in national and international news outlets including The Hill, CBS, The Washington Post, and Insider.

80.    Je Donna Dinges owns and operates a boutique in Ferndale, Michigan called Margaux & Max.

81.    The viral news coverage about the KKK flag incident brought increased public attention to Je Donna's name and her store, including unwanted attention from racist people. Strangers from around the country who had never visited her store left disparaging comments and reviews on her business's Facebook and Google pages.

82.    Some of these comments invoked racist and discriminatory language. For example, one commenter left a bad review of the store under the name "Nate Higgers."

83.    During this time, Je Donna Dinges operated her business from her storefront via curbside pickup and online sales because of the COVID-19 pandemic.

84.    Je Donna's friends and clients would accompany her during the hours she worked because they feared for Je Donna's safety due to the hateful attention she received.

85.    Je Donna also received unwanted attention outside of her home. For at least a month, she noticed increased traffic on her block. Strangers often parked in

front of the Dingeses' house and stared at their home. This made Je Donna and India feel extremely uncomfortable and unsafe.

**Additional Evidence of Ryan Wilde's Animus Against Black People**

86.    Wilde and his family have a long record of harassment and racist behavior.

87.    Between February 2021, after the KKK flag incident, and December 2021, Helena Van Tol and her children repeatedly walked in front of the Dingeses' security camera.

88.    The Dingeses often saw footage of Van Tol and her children waving their arms in front of the camera to set off the motion detector.

89.    There was no entrance to Wilde's home in the common walkway. Wilde and Van Tol had little reason to walk in front of the camera other than to set off the camera's motion detector.

90.    When the motion detector went off, the Dingeses felt a sense of fear. The Dingeses feared for their safety given the history of hostile actions taken by Wilde.

91.    Additionally, following the publicity about the KKK flag incident, a woman who had previously met Wilde through a dating app shared screenshots with Je Donna's former attorney of a conversation she had with Wilde.

92.   In these messages, Wilde complained about how much he hated the Black woman who lived next door to him; Je Donna Dinges was the only Black neighbor near Wilde at the time. Je Donna viewed these screenshots.

93.   Several public officials told Je Donna Dinges on multiple occasions that they are hesitant to approach Wilde because he is known to be dangerous and anti-police.

94.   An internal police email, dated February 17, 2021, illustrates how the police feared for their safety. The email stated that Wilde has 9 handguns registered to him and that officers needed to "be safe and extra diligent while giving special attention to the area."

95.   A police report, dated April 19, 2021, also highlights how the police perceived Wilde. After receiving a voicemail message from Wilde that referred to Je Donna Dinges by the "N" word, the writer of the report "requested special attention, by patrol, to the 1100 block of Wayburn." *See Exhibit 2.*

96.   Following the KKK flag incident, the Grosse Pointe Park police department told Je Donna that they would increase patrol near Wilde's home, but this increase did not happen. The lack of police presence contributed to the Dingeses' fear that Wilde would harm them without consequence.

97.   Between September 2020 and December 2020, Van Tol's children repeatedly watched the Dingeses through their window.

98.   The Dingeses began closing their curtains at all times to maintain their privacy.

99.   On February 11, 2019,  Darrell Dinges pulled a fallen tree branch into the shared walkway between the Wilde and Dinges homes.

100.  Wilde called the police and threw the branch onto the Dingeses' yard.

101.  Je Donna Dinges found the tree branch in her front yard flower bed. Given the history of hostility between the neighbors, the Dingeses feared creating further conflict between the parties, so Mr. Dinges removed the tree branch from their yard.

102.  On April 3, 2018, a neighbor called the police to report that Wilde emptied his trash bin into the street and kicked all of the garbage in front of the Dingeses' home. Police issued Wilde a violation for littering.

103.  On April 9, 2017, two bystanders called the police when they witnessed Wilde driving erratically and above the speed limit on a street where children were crossing.

104.  The bystanders reported to police that Wilde stopped to confront them and "had a pistol on his hip in plain view and was drinking from a red plastic cup."

105.   On August 4, 2010, Wilde's mother, Karen McIntosh, was driving through a parking lot and allegedly almost hit another driver while backing out of a parking space.

106.   According to a report made shortly after the incident, the driver stated that Wilde called him the "N" word as he passed him. *See Exhibit 3.*

**Injuries to Plaintiffs**

107.   Wilde's conduct was the direct and proximate cause of the Dinges family's decision to move out of their home on Wayburn Street in December 2021.

108.   The Dingeses moved to another house in Grosse Pointe Woods, incurring several thousand dollars in moving expenses and a significant increase in rent for a smaller, less desirable house.

109.   Je Donna Dinges's sleep was affected by increased stress and anxiety as a result of Wilde's harassment and discrimination.

110.   Je Donna Dinges has an inflammatory disease called Sarcoidosis, which causes the immune system to overreact. She developed the disease before moving into the house next to Wilde, but the stress and anxiety she experienced as a result of Wilde's discrimination significantly exacerbated her symptoms, leading her to visit an ophthalmologist for eye inflammation.

111.   Je Donna had to take prescribed steroids to treat the inflammation that was caused by the stress of these events.

15

112. India Dinges's sleep, anxiety levels, and mental health were exacerbated by increased stress and fear as a result of Wilde's discrimination. India often had nightmares that involved her and Je Donna being shot and killed by Wilde. She continues to have dreams that make her feel anxious and unsafe.

113. India Dinges also suffered from anxiety and disrupted sleep due to the shock, anxiety, and severe mental disturbance caused by witnessing Wilde's treatment of her mother, Je Donna Dinges.

114. India sought therapy twice a week to cope with the distress caused by Wilde.

115. India Dinges's academic performance suffered as a result of the stress, eventually leading to her withdrawal from her college courses in late March 2021. India had to pay a fee to withdraw and never received reimbursement for the tuition she had paid. India has not returned to school.

116. The Dingeses suffered and continue to suffer embarrassment, humiliation, emotional distress, anxiety, and loss of civil rights resulting from Wilde's discriminatory actions.

117. Further, Wilde's discrimination was intentional, malicious, and in wanton or reckless disregard of the Dingeses' rights to be free from racial discrimination and emotional distress, entitling them to an additional award of punitive damages.

16

## CAUSES OF ACTION

### <u>COUNT I</u>
### VIOLATION OF 42 U.S.C. § 1982

118. The Dingeses reallege and reincorporate by reference as if fully set forth herein allegations in all preceding paragraphs.

119. 42 U.S.C. § 1982 provides, in relevant part, that "[a]ll citizens of the United States shall have the same right as is enjoyed by white citizens to . . . hold real and personal property."

120. The right to "hold" one's property includes the right to use one's property.

121. The Dingeses are Black and are thus members of an identifiable class of persons who are subject to discrimination based on their race.

122. Wilde, who is white, intended to discriminate against the Dingeses on the basis of their race and interfere with the use of their property.

123. Wilde's placement of the full gas canister in the Dingeses' recycling bin with the intent to threaten the Dingeses based on their race violated their rights under 42 U.S.C. § 1982.

124. Wilde's hanging of the KKK flag in his window with the intent to threaten the Dingeses based on their race violated their rights under 42 U.S.C. § 1982.

125. Wilde also intimidated Je Donna Dinges based on her race when he blocked her entrance to her home from the common walkway.

126.   Wilde intentionally caused the Dingeses to fear that he would harm them by consistently carrying a gun and by firing the gun while they were home.

127.   Wilde's discriminatory conduct abridged the Dingeses' right to hold their property under 42 U.S.C. § 1982.

## COUNT II
## VIOLATION OF THE MICHIGAN ETHNIC INTIMIDATION ACT

128.   The Dingeses reallege and reincorporate by reference as if fully set forth herein allegations in all preceding paragraphs.

129.   The Act provides, in relevant part, that "[a] person is guilty of ethnic intimidation if that person maliciously, and with specific intent to intimidate or harass another person because of that person's race . . . [c]auses physical contact with another person . . . [d]amages, destroys, or defaces any real or personal property of another person [or] [t]hreatens, by . . . act," to do so "if there is reasonable cause to believe that an act . . . will occur." M.C.L. § 750.147b.

130.   Wilde's hanging of the KKK flag in his window indicates malice and the specific intent to intimidate and harass the Dingeses based on their race.

131.   Wilde's hostility and actions as outlined above were taken because the Dingeses are Black. Wilde had a history of stating that he hated his *Black* neighbor.

18

132.    Wilde's placement of a gas canister in the Dingeses' recycling bin filled
with flammable materials indicates Wilde's intent to threaten physical harm
to the Dingeses and their property.

133.    Wilde's actions as outlined above were malicious and taken to intimidate
and/or harass the Dingeses, including but not limited to:

    a.  Hanging a KKK "Invisible Empire" flag in a window that faced and
        was only visible to the Dinges household;

    b.  Blocking Je Donna's access to their shared walkway;

    c.  Entering the Dingeses' backyard to place a gas canister into the
        recycling bin;

    d.  Throwing a tree branch onto the Dingeses' property;

    e.  Staring at India Dinges through her window;

    f.  And other intimidating and discriminatory conduct.

134.    The Dingeses reasonably believed that Wilde would cause harm to them
and/or their personal property because his actions emphasized that as a
neighbor of the Dingeses he had unique access to them.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

135.    The Dingeses reallege and reincorporate by reference as if fully set forth
herein allegations in all preceding paragraphs.

19

136. Wilde's conduct as outlined above was intentional, including but not limited to:

   a. Hanging a KKK "Invisible Empire" flag in a window that faced and was only visible to the Dinges household;

   b. Blocking Je Donna's access to their shared walkway;

   c. Entering the Dingeses' backyard to place a gas canister into the recycling bin;

   d. Throwing a tree branch onto the Dingeses' property;

   e. Staring at India Dinges through her window; and

   f. Other intimidating and discriminatory conduct.

137. Wilde's conduct as outlined above was extreme, outrageous, and of such character as not to be tolerated by a civilized society. In fact, his outrageous conduct incited street demonstrations of hundreds of people protesting his racist acts.

138. Wilde's conduct is reminiscent of a time in our history when the KKK attacked Black people who moved into white neighborhoods, including using gasoline to light fire to the homes of Black residents. Such conduct is considered shameful, extreme, outrageous, and is no longer tolerated in modern society.

139.   Wilde acted with a discriminatory intent to cause, or with a reckless disregard for the probability to cause, the Dingeses humiliation, mental anguish, and substantial and enduring emotional distress. As a next door neighbor of the Dingeses, Wilde knew that his conduct would directly impact the Dingeses.

140.   As a direct and proximate result of Wilde's actions against the Dingeses, the Dingeses have suffered and continue to suffer from significant and enduring emotional distress, including humiliation, mental anguish and physical distress, and injury to mind and body.

## <u>COUNT IV</u>
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

141.   The Dingeses reallege and reincorporate by reference as if fully set forth herein allegations in all preceding paragraphs.

142.   Wilde threatened to inflict serious injury on Je Donna Dinges of a nature capable of causing severe mental disturbance to Je Donna.

143.   Je Donna suffered actual physical and emotional harm as a direct and proximate result of Wilde's conduct.

144.   India Dinges is an immediate member of Je Donna's family.

145.   India Dinges suffered and continues to suffer from the fairly contemporaneous shock of the threatened or inflicted injury to her mother, Je Donna, including significant and enduring emotional distress

21

encompassing humiliation, mental anguish and physical distress, and injury to mind and body.

## COUNT V
## NEGLIGENCE

146. The Dingeses reallege and reincorporate by reference as if fully set forth herein allegations in all preceding paragraphs.

147. Wilde owed the Dingeses a duty of care, including but not limited to a:

    a. Duty not to coerce, intimidate, threaten, or interfere with the Dingeses in the exercise or enjoyment of their property rights; and

    b. An obligation to act in a careful, lawful, and prudent manner and in full compliance with applicable law.

148. Wilde breached that duty with his conduct as outlined above, including but not limited to:

    a. Hanging a KKK "Invisible Empire" flag in a window that faced and was only visible to the Dinges household;

    b. Blocking Je Donna's access to their shared walkway;

    c. Entering the Dingeses' backyard to place a gas canister into the recycling bin;

    d. Throwing a tree branch onto the Dingeses' property;

    e. Staring at India Dinges through her window;

    f. And other intimidating and discriminatory conduct.

149.    As a direct and proximate result of Wilde's actions against the Dingeses, the

Dingeses have suffered and continue to suffer from significant and enduring

emotional distress including humiliation, mental anguish and physical

distress, and injury to mind and body.

## RELIEF REQUESTED

150.    The Dingeses respectfully request that this Honorable Court grant the

following relief against Wilde:

    a.   Enter a judgment declaring that Wilde violated the Dingeses' right to

       hold property under 42 U.S.C. § 1982;

    b.   Enter a judgment declaring that Wilde violated the Michigan Ethnic

       Intimidation Act.

    c.   Enter a judgement declaring Wilde liable to the Dinges for intentional

       infliction of emotional distress and negligence.

    d.   Enter a judgment against Wilde awarding the Dingeses compensatory,

       punitive, and exemplary damages in an amount that is fair and just;

    e.   Enter a judgment against Wilde awarding the Dingeses three times the

       actual damages they suffered, as they are entitled to under the

       Michigan Ethnic Intimidation Act. M.C.L. § 750.147b(3)(a);

f.  Grant the Dingeses reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and pursuant to any other rule or statute allowing for an award of attorneys' fees and costs; and

g.  Grant such other and additional relief to which they are entitled as a matter of law and/or equity that the Court finds just and appropriate under the circumstances.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Anna Silk*
Sarah Hall*
CIVIL RIGHTS LITIGATION INITIATIVE
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
annasilk@umich.edu
samarie@umich.edu

Counsel for Plaintiff

* Student Attorneys practicing pursuant to
  Local Rule 83.21

Dated: November 14, 2023

## JURY DEMAND

Plaintiffs, through their counsel, hereby demand a jury trial as to issues to which there exists a right to trial by jury.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Anna Silk*
Sarah Hall*
CIVIL RIGHTS LITIGATION INITIATIVE
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
annasilk@umich.edu
samarie@umich.edu

Counsel for Plaintiff

* Student Attorneys practicing pursuant to
  Local Rule 83.21

Dated: November 14, 2023