UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JE DONNA DINGES and INDIA DINGES,

    Plaintiffs,

v.

                              Case No. 23-cv-12885
                              Honorable Linda V. Parker

RYAN WILDE,

    Defendant.
_____/

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO DISMISS**

On November 14, 2023, Plaintiffs Je Donna Dinges and India Dinges (collectively "the Dingeses"), filed this civil rights action against their former neighbor, Defendant Ryan Wilde, alleging violations under 42 U.S.C. § 1982 (Count I) and state law (Counts II-V). (ECF No. 1.) In their Complaint, the Dingeses allege that Wilde's racist threats forced them to move from their home in Grosse Pointe Park, Michigan. (*Id.* at PageID. 1.)

The matter is presently before the Court on Wilde's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 13.) The motion is fully briefed. (ECF Nos. 17, 18.) For the reasons stated below, the Court is denying the motion.

I.  **Standard of Review**

"Rule 12(b)(1) motions to dismiss for lack of jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack challenges the sufficiency of the pleading itself. In that instance, the court accepts the material allegations in the complaint as true and construes them in the light most favorable to the nonmoving party. *See United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235-37 (1974)). A factual attack, in comparison, challenges "the factual existence of subject matter jurisdiction." *Id.*

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . .." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court "construes the complaint in the light most favorable to the plaintiff," *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 209) (cleaned up), and must "accept all of the complaint's factual allegations as true," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668; *L.C. v. United States*, 83 F.4th 534, 550 (6th Cir. 2023) (internal quotation marks and citation omitted) (explaining that the court "need not accept as true legal conclusions or unwarranted factual inferences"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir.

3

1989)). A court that considers such matters must first convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The court may take judicial notice only "of facts which are not subject to reasonable dispute." *Jones v. Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (quoting *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005)).

Wilde attaches several exhibits to his motion. The Dingeses specifically object to Exhibits 2 and 5, arguing that they are matters outside the pleadings and not properly considered on a Rule 12(b)(6) motion. Because the Complaint does not refer to these exhibits, nor are they central to the Dingeses' claims, the Court declines to consider them. *See Bassett*, 528 F.3d at 430. The Court, therefore, is not converting Wilde's motion into one for summary judgment under Rule 56. *See* Fed. R. Civ. P 12(d).

4

## II.     Factual & Procedural Background[1]

From 2011 to 2021, Je Donna Dinges ("Mrs. Dinges") and India Dinges ("Ms. Dinges"), an African American mother and daughter, lived in a rental home in Grosse Pointe Park, Michigan.  (ECF No. 1 at PageID. 2, 4.)  In 2017, the Dingeses allege that Wilde, a white male, moved into the house next door.  (*Id.* at PageID. 5.)  The two homes shared a common walkway between them.  (*Id.*)  According to the Dingeses, the parties did not have a cordial relationship.  (*Id.*)

The Dingeses contend that tensions with Wilde arose as early as December 2017, when they heard gunshots at night and allegedly saw Wilde "shooting repeatedly from his back porch into the air."  (*Id.*)  After the incident, Mrs. Dinges and other neighbors reported the shots to police, who briefly visited the scene. (*See id.* at PageID. 6.)  Later that day, Mrs. Dinges alleges she arrived home from a shopping trip to find Wilde "pacing back and forth in the [shared] walkway and staring at [her] in an intimidating manner."  (*Id.*)  She claims Wilde was "physically blocking her from moving past him on the walkway[,]" preventing her from entering her home through the side door.  (*Id.*)

Other incidents followed, according to the Dingeses.  On April 3, 2018, they allege that Wilde "emptied his trash bin into the street and kicked all of the garbage

---

[1] Wilde presents conflicting evidence to dispute the Dingeses' allegations, but for purposes of a 12(b)(6) motion to dismiss, the Court must accept their allegations as true.

5

in front of the Dingeses' home." (*Id.* at PageID. 15.) The following year, on February 11, 2019, when Mrs. Dinges' then-husband, Darrell Dinges ("Mr. Dinges"), pulled a fallen tree branch into the shared walkway, Wilde "called the police and threw the branch onto the Dingeses' yard." (*Id.*) Mrs. Dinges later found the tree branch in her front flower bed. (*Id.*)

In the summer of 2020, the Dingeses' neighbors observed gas canisters on Wilde's front porch. (*Id.*) The Dingeses claim this marked the beginning of a series of incidents involving gas canisters placed near or on their property. (*See generally id.* at PageID. 7).

In mid-January 2021, Mr. Dinges discovered a full gas canister in their recycling bin. (*Id.*) Concerned, the Dingeses reported the incident to police, who advised them to install a home security camera. (*Id.*) They followed this advice, positioning a "camera [to be] trained at the back fence and walkway in between the Dingeses' and Wilde's property." (*Id.* at PageID. 8.) On February 2, 2021, Wilde contacted police, complaining that the Dingeses' camera pointed into his dining room. (*Id.*) According to the Complaint, officers told Wilde there was nothing they could do and suggested he "hang up curtains or blinds." (*Id.*)

Two weeks later, on February 16, 2021, Mr. Dinges noticed "a 'Ku Klux Klan Invisible Empire' flag hanging in the window of Wilde's home[.]" (*Id.* at PageID. 9.) The flag, according to the Complaint, "was hanging approximately

6

five feet from [the Dingeses'] home, could not be seen from the street, the sidewalk, or from any other house except for the Dingeses family house." (*Id.* at PageID. 10.)

Mrs. Dinges, feeling "terrorized[,]" posted about the flag on her Facebook page. (*Id.*) The post drew the attention of a local news reporter, who contacted law enforcement, prompting police to visit Wilde's home. (*Id.*) Police spoke with Wilde's then-girlfriend, Helena Van Tol ("Van Tol"), who allegedly admitted that while "she understood that the KKK flag was offensive," Wilde hung the flag "to block their windows from the view of the Dinges family's security camera." (*Id.* at PageID. 11.) According to the Complaint, Van Tol claimed they "did not have money for window curtains or blinds." (*Id.*) In response, police offered to purchase curtains for Wilde if he removed the flag. (*Id.*) He agreed and "took down the flag immediately." (*Id.*)

The flag incident triggered an immediate response from the community. (*Id.*) On February 21, 2021, residents of Grosse Pointe Park organized an anti-hate rally, which garnered national media attention. (*Id.* at PageID. 11-12.) Following the media coverage, Mrs. Dinges' boutique shop in Ferndale, Michigan became the target of online harassment. (*Id.* at PageID. 12.) She claims that individuals posted disparaging reviews and racially discriminatory comments on social media.

7

(*Id.*)  For her safety, Mrs. Dinges states that "friends and clients would accompany her during the hours she worked[.]"  (*Id.*)

On April 18, 2021, Wilde again called police to complain about the Dingeses' security camera.[2]  (ECF No. 1-3 at PageID. 32.)  Wilde left detectives a voicemail "filled with racial expletives," and he "used the 'N' word multiple times while referring to [Mrs. Dinges]."  (ECF No. 1 at PageID. 11.)  According to the police report, Wilde threatened to "put 'the flag' back up" if detectives did not investigate Mrs. Dinges for harassment.  (ECF No. 1-3 at PageID. 32.)

On July 21, 2021, in another incident involving gas canisters, Ms. Dinges claims she saw two canisters on Wilde's front porch.  (*Id.* at PageID. 8.)  She believed this was an attempt by Wilde "to intimidate [the Dingeses] in response to their continued use of a security camera."  (*Id.*)  Later that month, while working in her home office, Ms. Dinges observed Wilde "staring intimidatingly at her from his window."  (*Id.* at PageID. 9.)  She asserts that "the intimidating stare made [her] fearful of living in her own home."  (*Id.*)

By December 2021, the cumulative effect of these incidents forced the Dingeses to vacate their home in Grosse Pointe Park.  (*Id.* at PageID. 3.)  They

---

[2] According to the Complaint, this call is listed as occurring on February 19, 2021, (ECF No. 1 at PageID. 11), but attached Exhibit 2 indicates the actual date was April 18, 2021.  (ECF No. 1-3 at PageID. 32.)

8

moved to what they describe as a "smaller, less desirable house[]" in Grosse Pointe Woods, resulting in "a significant increase in rent[.]" (*Id.* at PageID. 16.)

On November 14, 2023, they filed this civil rights action alleging the following claims against Wilde: (I) infringement of the right to hold property in violation of 42 U.S.C. § 1982; (II) racially motivated intimidation and infringement of property rights in violation of the Michigan Ethnic Intimidation Act; (III) intentional infliction of emotional distress; (IV) negligent infliction of emotional distress; and (V) negligence. (*See generally* ECF No. 1.) Wilde responded to the Complaint by filing the pending motion to dismiss. (ECF No. 13.)

## III. An Overview of the Parties' Arguments

Wilde raises several arguments in support of his motion to dismiss. First, he argues that the Court lacks subject matter jurisdiction because the Dingeses fail to allege the requisite racial animus necessary to state a claim under § 1982. Second, Wilde contends the Dingeses lack an actual property interest in their rental home and, as a result, cannot establish standing to bring their claim. These arguments, however, frame merits issues as jurisdictional defects.

On the merits, Wilde asserts that the Dingeses' allegations of racial animus fail to demonstrate the level of property interference necessary to state a claim under § 1982. To the extent the Dingeses allege any acts of racial animus, Wilde

9

further argues that they fail to establish a nexus between those acts and an adverse housing action. Finally, Wilde contends that upon dismissal of the Dingeses' § 1982 claim, the Court should decline to exercise supplemental jurisdiction over their state law claims.

As indicated, Wilde's jurisdictional arguments are, in substance, challenges to the sufficiency of the Dingeses' claims. Whether they have alleged facts sufficient to establish racial animus under § 1982 is a question of whether they have stated a claim, not whether the Court has jurisdiction. The same is true of whether those allegations, if taken as true, resulted in the deprivation of a property interest. When the jurisdictional question is intertwined with the merits, a "motion to dismiss for lack of subject[] matter jurisdiction under [Rule] 12(b)(1) . . . 'is more properly considered a Rule 12(b)(6) motion to dismiss for failure to state a claim.'" *See Lindenbaum v. Realgy, LLC*, 13 F.4th 524, 527 (6th Cir. 2021) (citing *Orion Marine Constr., Inc. v. Carroll*, 918 F.3d 1323, 1330 (11th Cir. 2019)). Accordingly, Wilde's jurisdictional arguments are properly analyzed under Rule 12(b)(6), not 12(b)(1).

The Dingeses respond that the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4). On the merits, the Dingeses argue their Complaint sufficiently alleges facts to state a plausible claim under § 1982. They point to a three-prong pleading standard from *Johnson v. City of Ecorse*, 137 F.

10

Supp. 2d 886, 890 (E.D. Mich. 2001), claiming to satisfy each element necessary to plead a § 1982 claim: (1) they are members of a racial minority; (2) Wilde intended to discriminate on the basis of race; and (3) the discrimination concerned one of the statute's protected activities.

## IV. Applicable Law and Analysis

### A. 42 U.S.C. § 1982

Section 1982 provides that "all citizens of the United States shall have the same right in every state . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property." 42 U.S.C. § 1982. Congress enacted § 1982 to prohibit racial discrimination in housing, *United States v. Brown*, 49 F.3d 1162, 1166 (6th Cir. 1995) (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437 (1968)), and the statute's protections extend to "interference from any source . . . whether governmental or private[,]" *Jones*, 392 U.S. at 424 ("[T]he Act was designed . . . to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein— including the right to purchase or lease property.").

A § 1982 claim, like a claim under § 1981, requires that a plaintiff plead racial animus. *Moniz v. Cox*, 512 F. App'x 495, 501 (6th Cir. 2013) (citations omitted). Although the Sixth Circuit has not yet articulated a test for pleading racial animus under § 1982, district courts in this Circuit have adopted the

11

framework employed by the Second and Seventh Circuits.[3] *See, e.g.*, *Johnson v. City of Ecorse*, 137 F. Supp. 2d 886, 890 (E.D. Mich. 2001) (citing *Cedeno v. Wal–Mart Stores, Inc.*, No. 98-CV-479, 1999 WL 1129638, at *2 n. 7 (E.D. Pa. Nov. 30, 1999)); *Goodykoontz v. Cuyahoga Cnty.*, No. 1:24 CV 1309, 2024 WL 4519253, at *4 (N.D. Ohio Oct. 17, 2024); *see also Whisby-Myers v. Kiekenapp*, 293 F. Supp. 2d 845, 850 (N.D. Ill. 2003). Under this approach, a plaintiff must allege facts suggesting that: (1) they are members of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one of the statute's protected activities.[4] *Johnson*, 137 F. Supp. 2d at 890. Applying the elements to the Complaint, the Court concludes that the Dingeses plausibly allege facts indicating that Wilde acted with racial animus.

First, the Complaint identifies the Dingeses as African American and thus members of a racial minority. *See Wells v. Rhodes*, 928 F. Supp. 2d 920 (S.D.

---

[3] The Second and Seventh Circuits derived their test for pleading a § 1982 claim from the same elements used to plead a § 1981 claim. *E.g.*, *Brown v. City of Oneonta*, 195 F.3d 111, 121 (2d Cir. 1999); *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). This is consistent with the Supreme Court's instruction that courts construe §§ 1981 and 1982 similarly. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 447 (2008).

[4] Because the Sixth Circuit uses an identical test for pleading a § 1981 claim, *see Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 755 (6th Cir. 2023), the Court believes it would find the same test appropriate for analyzing a § 1982 claim.

Ohio 2013) ("African Americans[] belong to an identifiable class that has been subject to discrimination based on race."). Wilde does not dispute the Dingeses' race and acknowledges they are African American. The Court therefore finds the first element satisfied.

Second, the Dingeses describe multiple incidents between December 2017 and February 2021 that plausibly support Wilde's intent to discriminate on the basis of race. Wilde does not explicitly dispute that he acted with discriminatory intent. Instead, he challenges the sufficiency of the Dingeses' allegations to establish intent to discriminate under § 1982. While he disputes certain factual allegations, Wilde ultimately maintains that the remaining allegations, even if accepted as true, are insufficient to support a claim under § 1982.

Intentional discrimination "can be shown through either direct evidence of discrimination or circumstantial evidence 'which would support an inference of discrimination.'" *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 755 (6th Cir. 2023) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000)). Direct evidence, "if believed, requires the conclusion that the unlawful discrimination was at least a motivating factor in the [defendant's] actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). Circumstantial evidence does not establish discriminatory animus on its own, but it allows the factfinder to draw a reasonable inference that

13

discrimination occurred. *Id.* At the pleading stage, however, a plaintiff "[does] not need to prove discriminatory intent, but rather [must] allege facts making it plausible that such intent existed." *Inner City Contracting*, 87 F.4th at 755.

The Complaint alleges, among other things, that Wilde: (1) hung a Ku Klux Klan ("KKK") flag "approximately five feet from the Dinges home, [which] could not be seen from the street, the sidewalk, or from any other house except for the Dingeses family house[]"; and (2) used racial expletives while referring to Mrs. Dinges. (ECF No. 1 at PageID. 9, 11.) Displays of KKK imagery and racial slurs have long been recognized as expressions of hostility and "hatred towards African Americans." *See Wells*, 928 F. Supp. 2d at 927, 933 (finding that language such as "KKK will make you pay" and the "N-word" support an inference of discriminatory animus); *see also Cotton v. Duncan*, No. 93 C 3875, 1993 WL 473622, at *4 (N.D. Ill. Nov. 15, 1993) ("Attempting to erect and ignite a cross that reads 'KKK Rules' on an African-American family's lawn is precisely the type of conduct section 1982 is designed to remedy.").

Wilde does not dispute that he "draped a KKK flag in his dining room window[,]" which he admits was "most distasteful." (ECF No. 13 at PageID. 150, 153.) Nor does he dispute that "he called [Mrs.] Dinges the N-word in a voicemail message to [police.]" (*Id.* at PageID. 150.) He contends these actions were in response to the Dingeses' security camera—not intentional discrimination—and

14

therefore cannot support a § 1982 claim. (*Id.*) However, a defendant's denial of specific intent does not warrant dismissal when the circumstances plausibly suggest that he intended to discriminate against a plaintiff on the basis of race. *See Wells*, 928 F. Supp. 2d at 927 ("[Defendant's] denial of specific intent does not save[] him from summary judgment under the circumstances of this [§ 1982 claim].").

The Court finds that the circumstances plausibly suggest Wilde intended to discriminate on the basis of race. Wilde displayed the KKK flag shortly after the Dingeses installed their security camera, which they set up after suspecting Wilde had trespassed on their property to place a full gas canister in their recycling bin. Wilde himself called the flag "most distasteful," which further supports the inference that he intended it as an expression of hostility toward the Dingeses. (*See* ECF No. 13 at PageID. 153.) If that were not enough, approximately two months later, Wilde used the N-word to refer to Mrs. Dinges in a voicemail to a detective, threatening to "put 'the flag' back up." (ECF No. 1-3 at PageID. 32.) In his motion, Wilde acknowledges that both acts constitute "racial animus being directed at the [Dingeses]." (ECF No. 13 at PageID. 143.) Even under his own characterization, the Dingeses have pleaded sufficient facts to establish intentional discrimination under § 1982. The Court finds the second element satisfied.

15

Third, the Dingeses allege that Wilde's racially motivated conduct forced them to vacate their home and relocate to a neighboring city. Wilde asserts several arguments contending his actions did not rise to the level of interference required to establish a violation under § 1982. The Court considers each argument in turn.

At the outset, Wilde argues that the Dingeses lack a concrete property interest in their rental home because the Complaint does not allege that they attempted "to purchase, sell or lease" it. (ECF No. 13 at PageID. 144.) Absent such attempts, Wilde contends that they cannot establish a deprivation of their right to hold the property.

The Sixth Circuit, however, has recognized that "to hold" property under § 1982 includes the right "to use" it. *United States v. Brown*, 49 F.3d 1162, 1167 (6th Cir. 1995) (concluding that non-owners' "use" of property is a protected civil right under § 1982). Regardless of ownership, plaintiffs may "hold" property if "they use [it] and live there." *House of Providence v. Meyers*, 458 F. Supp. 3d 621, 633 (E.D. Mich. 2020) ("This suffices to confer standing on all of the plaintiffs."). Here, the Dingeses allege that they lived in and rented their home from 2011 to 2021. (ECF No. 1 at PageID. 4.) Because they rented the property, they had the right to use it, which § 1982 protects. The Complaint sufficiently alleges the deprivation of a protected right under § 1982.

Next, Wilde argues that even if the Dingeses "hold" the property, their allegations "do not rise to the level of 'interference' recognized by the [c]ourts in neighborhood disputes." (ECF No. 13 at PageID. 148.) Wilde specifically asserts that § 1982 claims "based on the right to hold property—as opposed to the sale or rental of property—involve extreme acts of violence or outrageous harassment[.]" (*Id.* at PageID. 139.)

To support his argument, Wilde cites *Wells v. Rhodes*, 928 F. Supp. 2d 920, 926 (S.D. Ohio 2013) (collecting cases involving racially motivated discrimination through cross-burning, the use of flash simulators and firebombs, and related conduct in conjunction with the use of racial epithets directed at neighboring property holders). The *Wells* court, however, did not establish violence as a necessary element to show interference of a protected activity under § 1982; rather, it identified such acts as sufficient to trigger the statute's protections. *See* 928 F. Supp. at 927 ("As the case law detailed above indicates, intimidating and threatening acts . . . deny a person the equal right to hold property as enjoyed by other citizens.").

Other courts have noted that "violence suffices to make out such a claim, but it is not necessary." *House of Providence*, 458 F. Supp. 3d at 633. Harassment and intimidation—such as stalking, trespassing on property, and the use of racial epithets—may interfere with the use and enjoyment of property just as effectively

17

as burning a cross on the property's front lawn. *Id.* at 634 (finding such allegations sufficed to state a claim under § 1982). The Court rejects Wilde's argument that § 1982 requires the Dingeses to allege "violence, destruction or criminal conduct[.]" (ECF No. 13 at PageID. 148.)

According to the Complaint, the Dingeses moved from their Grosse Pointe Park home in December 2021, approximately ten months after Wilde first displayed his KKK flag and eight months after he used a racial slur against Mrs. Dinges. (*See* ECF No. 1 at PageID. 3) While these incidents plausibly allege racial animus, the Dingeses also allege they were the focal point of a broader pattern of harassment. (*See generally id.*)

In January 2021, the Dingeses suspected Wilde of trespassing on their property to place a full gas canister in their recycling bin. (*Id.* at PageID. 7.) In two other incidents, the Dingeses allege interactions with Wilde that left them feeling intimidated and "fearful of living in [their] own home." (*Id.* at PageID. 6, 9.) Finally, in July 2021, five months after Wilde's display of the KKK flag, the Dinges claim he placed two gas canisters on his front porch in an open attempt to intimidate them further. (*Id.* at PageID. 8.) Taken together, the Court finds that the Dingeses sufficiently allege facts that plausibly suggest Wilde's actions interfered with their ability to use their home, ultimately forcing them to relocate. The Court therefore finds the third element satisfied.

Finally, Wilde makes a separate bare bones argument that his display of the KKK flag was "constitutionally protected [speech] and it cannot form the basis for a [§ 1982 claim]." (*Id.* at PageID. 153.) The Court quickly dispenses of this argument. To assess a First Amendment argument, the Court must examine "the content, form and context of [the] speech, as revealed by the whole record." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotations omitted). "[A]t the pleading stage . . . [such characteristics] of the speech cannot yet be properly evaluated." *House of Providence*, 458 F. Supp. 3d at 647 ("[A]t the current, early stage of this case, dismissal of the complaint would be inappropriate.").

In short, the Court finds that the Dingeses plead sufficient facts to state a claim under § 1982. Therefore, the Court is denying Wilde's motion to dismiss.

### B. State Law Claims

Wilde asks the Court to decline to exercise supplemental jurisdiction over the Dingeses' state law claims if it dismisses their federal claim. (ECF No. 13 at PageID. 153.) Because he presents no independent arguments for their dismissal, and because the Court is not dismissing the Dingeses' § 1982 claim, the state-law claims remain.

### V. Conclusion

In summary, the Dingeses allege sufficient facts to establish that Wilde acted with racial animus in violation of 42 U.S.C. § 1982. Because the Court has

19

subject-matter jurisdiction over this claim, it retains supplemental jurisdiction over the Dingeses' state law claims.

Accordingly,

**IT IS ORDERED** that Defendant's motion to dismiss (ECF No. 13) is **DENIED**.

                                          s/ Linda V. Parker
                                          LINDA V. PARKER
                                          U.S. DISTRICT JUDGE

Dated: March 21, 2025